**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-13-00232-CR**
_____

**BRYAN CHANCE MCBEE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 221st District Court
Montgomery County, Texas
Trial Cause No. 13-04-03591-CR

**MEMORANDUM OPINION**

Bryan Chance McBee appeals from his third-degree felony conviction for assault on a family member. *See* Tex. Penal Code Ann. § 22.01(a)(1), (b)(2) (West Supp. 2013). The jury found McBee guilty and assessed punishment at eight years in prison. McBee was convicted of assaulting T.P., a 47 year old female.

McBee argues on appeal that the evidence was legally insufficient to support his conviction, and that the trial court abused its discretion in assessing attorney fees against him. We conclude the evidence was legally sufficient to support his

conviction, but we otherwise modify the judgment to delete the assessment of attorney fees against McBee, and we affirm the judgment as modified.

**EVIDENCE PRESENTED AT TRIAL**

Testimony of T.P.

T.P. testified that she and McBee had been in an "on and off" relationship for about a year and a half, and that they were both homeless. T.P. explained that on or about April 19, 2012, she was at Chad's bar in Montgomery County. T.P. stated that McBee was angry at her for allegedly dating someone else. McBee confronted T.P. at Chad's bar, and McBee began using profanity and falsely accusing her of things.

T.P. was upset and she ran out of the bar. McBee texted her and told her he had stolen her money. T.P. left and went to a secluded wooded area where McBee stayed in a tent and waited for him. She planned to talk with him and get her money back. When McBee arrived late that evening, McBee and T.P. argued again. McBee threatened T.P. and her adult children. At one point T.P. "took off running" and McBee pursued her but T.P. tripped and fell. When she fell, McBee stated: "Oh, look, you broke your arm. Now I am going to have to kill you." McBee then stepped on her elbow, grabbed her wrist, yanked her off the ground, threw her into trees, kicked her, and threw her into a wooden bedframe in one of

the tents. McBee called her names, slapped her, and choked her with his hand. During the assault, McBee even called T.P.'s family and told them he had her, and then McBee put his phone on speaker phone so they could hear him assaulting her. The assault lasted hours. When T.P. awakened around 5:30 or 6:00 a.m. the next morning, McBee was still with her. He asked T.P. if she remembered what happened the night before. In order to get away, T.P. answered, "Yes. And I am so sorry." McBee was concerned T.P. would turn him into the police, and T.P. assured McBee that she would not. She told McBee that she loved him and that they could "go to like McDonald's or something like that and [she] would slip and fall and then he could sue them" and get money. McBee went back to sleep, and T.P. escaped to a restaurant near the wooded area where the tents were located.

T.P. stated that because she was in pain, embarrassed, and scared of McBee, she initially told the 911 operator that she fell. Later, she told Deputy Holden that McBee had assaulted her. She also told the investigating officer she wanted to press charges against McBee. T.P. testified that McBee had also assaulted her once before on November 16, 2010, when she and McBee were dating. In the earlier incident, McBee broke both of her wrists. A judgment convicting McBee of the 2010 assault/family violence was admitted into evidence.

3

Testimony from T.P.'s Adult Son

T.P.'s adult son testified that he had received a call from McBee during the assault, and McBee was threatening T.P.'s family. T.P.'s son could hear T.P. begging for help while McBee was hitting her and laughing at her. T.P.'s son testified that he did not call law enforcement or come to her aid because he was unaware of T.P.'s and McBee's location.

Testimony from Paramedic

Clayton Rosencranz, a paramedic for Montgomery County Hospital District, testified that he responded to a call in the early morning hours of April 20, 2012, from a local restaurant. When Rosencranz arrived at the restaurant, bystanders at the restaurant directed him to an emotionally distraught female sitting in a booth inside the restaurant. The female, T.P., was crying hard, breathing rapidly, and holding her arm. T.P. initially told Rosencranz that she injured her arm by tripping and falling. Based on T.P.'s visible injuries and emotional state, Rosencranz did not think her story "add[ed] up." When Rosencranz began to ask specifics about how her injuries occurred, T.P. "began to cry even worse" and told Rosencranz that she had been assaulted by her boyfriend.

T.P. informed Rosencranz that McBee, her boyfriend, was across the street in the woods, and because Rosencranz was concerned for her safety, he locked the

restaurant door and called for law enforcement through dispatch. T.P.'s injuries, as observed by Rosencranz, were an obvious closed-elbow deformity, blood in her right eye, a bruised jaw, a bruised neck, and bruising to her entire back. She was in extreme pain and Rosencranz was concerned that she had sustained possible rib or spinal fractures.

<u>Testimony from Azwell and Holden</u>

Deputy Chris Azwell with the Montgomery County Sheriff's Office also testified. Azwell was dispatched to the restaurant. He interacted briefly with T.P. prior to her transport to the hospital. According to Azwell, T.P. had either a broken or dislocated arm, "[d]eep, dark, purple bruising" on her sides and back, lacerations and scratches on her upper body, and dried blood around her mouth. T.P. told Azwell that McBee was the person who had injured her, and she provided Azwell details of McBee's location, which was a wooded area approximately three or four hundred yards from the restaurant. Azwell and three other officers looked for McBee and found him in a tent in the woods. McBee appeared startled when he saw the officers and said, "What did she do?" McBee was detained, escorted to a patrol car, and given his Miranda rights. Azwell did not observe any injuries to McBee.

Deputy Lance Holden with the Montgomery County Sheriff's Office met with T.P. at the hospital, and he described his interview of T.P. for the jury. She was cooperative but hesitant to speak with Holden. Holden stated that T.P. was certain that McBee would kill her the next time she came into contact with him. Holden photographed T.P.'s injuries, and the photographs were admitted into evidence at trial. Holden testified that he thought T.P.'s wounds appeared fresh, and that T.P. was in "[s]evere pain." Holden described her primary injuries as those to her elbow and her ribs. He testified that he saw handprints on her throat prior to the medical staff's placement of a neck brace on her neck. She also appeared to have broken blood vessels in her eyes which Holden believed were consistent with being strangled.

Testimony from Defense Witness

Matthew Butcher testified for the defense. Butcher and McBee had worked together for seven years. He worked with McBee earlier on the day of the assault and went with him to Chad's bar. Butcher explained that after they were at the bar for ten or fifteen minutes, T.P. called the bar and told Butcher that she had fallen over a bicycle and broken her arm. She was upset and said she needed Butcher to bring McBee home. Butcher took McBee immediately to where he lived in the woods, and then Butcher went home.

6

## LEGAL SUFFICIENCY

In issue one, McBee contends the evidence is legally insufficient to support his conviction. He specifically argues that the testimony was insufficient to allow a jury to reasonably infer that he was not acting in self-defense. As requested by McBee, the jury charge included a self-defense instruction.

It is the defendant's burden to produce some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Upon producing such evidence, the State has the burden of persuasion to disprove the defense. *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991). The State is not required to produce evidence to refute the claim but is required to prove its case beyond a reasonable doubt. *Id.* at 913. The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject the defensive issue. *Id.* at 913-14. A jury's verdict of guilt is an implicit finding rejecting a defendant's self-defense theory. *Id.* at 914.

We review all of the evidence in the light most favorable to the verdict and determine if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010). Because the State carries the burden of persuasion to disprove self-defense beyond a reasonable

doubt, we review a challenge to the sufficiency of the evidence supporting a jury's rejection of a claim of self-defense under only the *Jackson* standard. *Saxton*, 804 S.W.2d at 914.

In reviewing the evidence, we give deference to the jury to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We treat direct and circumstantial evidence equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The fact finder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

A person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to another. Tex. Penal Code Ann. § 22.01(a)(1). Although usually a Class A misdemeanor, the offense is elevated to a third-degree felony if it is committed against a person whose relationship with the defendant is described in sections 71.0021(b) (dating), 71.003 (family), or 71.005 (household) of the Texas Family Code, and if the defendant has been previously convicted of

8

an assault involving family violence. *See* Tex. Penal Code Ann. § 22.01(b)(2)(A); *see also* Tex. Fam. Code Ann. §§ 71.0021(b), 71.003, 71.005 (West 2014).

The jury heard T.P.'s testimony regarding the assault. She explained to the jury the violent assault by McBee—he grabbed her, stepped on her elbow, slapped her, threw her into trees and into the bedframe, choked her, and threatened to kill her. The jury heard law enforcement's testimony that the wounds appeared "fresh" and that T.P. appeared scared of McBee. The jury saw photographs of T.P.'s injuries and heard T.P.'s son's testimony of the telephone call from McBee during the assault. Evidence of McBee's prior assault against T.P. was also presented at trial, along with the 2010 judgment convicting him of assault/family violence. The only evidence of self-defense is McBee's videotaped comments while he was detained by police. In the video, McBee states that T.P. went "ballistic[,]"and kicked and hit him, so he slapped and pushed her. There is no indication in the record before us that McBee received any injury during the incident. The jury was not required to believe McBee's version of what transpired that day. After viewing the evidence in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a reasonable doubt and also could have found against McBee on his self-defense claim. We overrule issue one.

9

**ATTORNEY FEES**

In issue two, McBee argues the trial court abused its discretion in assessing attorney fees against him, because he is indigent. The State concedes the judgment should be modified to delete the award of attorney fees.

Under article 26.05 of the Texas Code of Criminal Procedure, the trial court has authority to order reimbursement of fees of an appointed attorney if the court determines that the defendant has financial resources that enable him to offset in part or in whole the costs of legal services provided to him. Tex. Code Crim. Proc. Ann. art. 26.05(g) (West Supp. 2013). Article 26.04 provides that the judges of courts trying criminal cases by local rule shall adopt and publish written countywide procedures for timely and fairly appointing counsel for an indigent defendant in the county, who is arrested for, charged with, or taking an appeal from a conviction of a misdemeanor punishable by confinement or a felony. *See* Tex. Code Crim. Proc. Ann. art. 26.04(a) (West Supp. 2013). McBee states in his brief that his first trial counsel was appointed by the trial court, and the State does not dispute that contention. McBee was living in a tent in the woods at the time of his arrest. He was appointed counsel for his appeal, and the trial court granted his motion for a free transcript on appeal. *See Mayer v. State*, 274 S.W.3d 898, 901 (Tex. App.—Amarillo 2008), *aff'd*, 309 S.W.3d 552 (Tex. Crim. App. 2010);

*Roberts v. State*, 327 S.W.3d 880, 883-84 (Tex. App.—Beaumont 2010, no pet.) (If a court determines that a defendant is indigent, then he is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs.).

The sum of $7,312.50 in attorney fees was taxed against McBee in the judgment. There is no evidence in the record that McBee's financial circumstances materially changed either after the appointment of counsel and before the trial of the case, or after the appointment of appellate counsel for appeal of the case. *See generally Cates v. State*, 402 S.W.3d 250 (Tex. Crim. App. 2013); *In re Daniel*, 396 S.W.3d 545, 547-50 (Tex. Crim. App. 2013). We therefore sustain issue two and modify the judgment to delete that portion of the judgment requiring that McBee pay attorney fees in the amount of $7,312.50. Otherwise, the judgment is affirmed as modified.

AFFIRMED AS MODIFIED.

_____
LEANNE JOHNSON
Justice

Submitted on February 26, 2014
Opinion Delivered April 9, 2014
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.